**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

ANTONIO CABALLERO,
    *Plaintiff*,

    v.

FUERZAS ARMADAS
REVOLUCIONARIAS DE
COLOMBIA *et al.*,
    *Defendants*.

No. 3:20-cv-1939 (JAM)

**RULING ON PENDING MOTIONS**

This is an action brought pursuant to the Terrorism Risk Insurance Act of 2002, a federal law that is intended to facilitate recovery by victims of international terrorism. The victim in this case seeks to execute against a Connecticut-based brokerage account that is held in the name of a company based in El Salvador. According to the victim, the El Salvadoran company is an agency or instrumentality of a Columbian terrorist organization known as the Fuerzas Armadas Revolucionarias de Colombia ("FARC") against whom the victim holds a money judgment.

The Court has previously granted the victim's *ex parte* application for turnover of the account funds. Since then, however, the Court stayed its order after the brokerage filed a third-party interpleader complaint and after the El Salvadoran company moved to vacate the turnover order and to dismiss this action. The victim has responded by moving to dismiss the interpleader complaint and to enforce the turnover order.

For the reasons set forth below, I will deny the victim's motion to dismiss the interpleader complaint and for enforcement of the turnover order. At the same time, I will deny the El Salvadoran company's motion to dismiss the victim's application for a turnover order. Instead, I conclude that there is a genuine issue of fact that warrants a continued freeze of the

brokerage account pending an evidentiary hearing on the issue of whether the El Salvadoran company was an agency or instrumentality of FARC such that a turnover order should enter.

## BACKGROUND

The primary plaintiff in this action is Antonio Caballero. He seeks compensation for harm inflicted by FARC, a Colombian entity that at relevant times was designated by the United States government as a terrorist organization.[1] According to Caballero, FARC tortured and killed his father, a former United Nations ambassador and an outspoken critic of narco-trafficking in Colombia.[2] Caballero claims that FARC murdered his father as part of a terroristic effort to deter opposition to its narco-trafficking operations.[3]

Caballero sued FARC in the United States District Court for the Southern District of Florida under a federal law known as the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a). That law authorizes civil lawsuits by nationals of the United States to recover damages for acts of international terrorism. The Florida court entered a default judgment for Caballero against FARC for more than $46 million of compensatory damages.[4]

Caballero sought to collect on this judgment. He registered his Florida judgment with this Court in October 2020.[5] Then he moved for a turnover order against a financial account

---

[1] *See, e.g.*, *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 545-46 (9th Cir. 2014) (discussing FARC's designation as a terrorist organization in 1997); Michael Crowley, *U.S. Removes Colombia's FARC Rebel Group from Terrorist List*, N.Y. TIMES (Nov. 30, 2021), https://www.nytimes.com/2021/11/30/us/politics/colombia-farc-us-terrorist-list.html [https://perma.cc/Y5LT-CTZ8].

[2] Doc. #28-8 at 1-2.

[3] *Ibid.*

[4] *See* Doc. #1-1; *see also Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 2020 WL 7481302, at *1, *7 (S.D. Fla. 2020) (describing Caballero's cause of action under the ATA and the damages awarded).

[5] Doc. #1. This action is one of many TRIA actions that Caballero has filed nationwide seeking to enforce his judgment against alleged agencies or instrumentalities of FARC. *See, e.g.*, *Caballero v. Fuerzas Armadas Revolucionarias De Colombia*, 562 F. Supp. 3d 867 (C.D. Cal. 2021); *Caballero v. Fuerzas Armadas Revolucionarias De Colombia*, 2021 WL 3927826 (S.D. Fla. 2021); *Caballero v. Fuerzas Armadas Revolucionarias de Columbia*, 2021 WL 307558 (W.D.N.Y. 2021), *recon. denied*, 2022 WL 71662 (W.D.N.Y. 2022); *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 2020 WL 11571726 (N.D. Cal. 2020).

maintained by a Connecticut-based brokerage firm known as Interactive Brokers, LLC.[6] The account at Interactive Brokers is not in FARC's name. Instead, it belongs to an El Salvadoran oil company known as ALBA Petróleos de El Salvador S.E.M. de C.V. ("ALBA").

Caballero claims the right to proceed against ALBA's brokerage account under a federal law known as the Terrorism Risk Insurance Act of 2002 ("TRIA"). That law provides in relevant part that for any person who "has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, … the blocked assets of that terrorist party (*including the blocked assets of any agency or instrumentality of that terrorist party*) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable." TRIA, § 201(a) (emphasis added), Pub. L. 107-297, 116 Stat. 2337 (codified as a note following 28 U.S.C. § 1610). According to Caballero, ALBA is within the scope of TRIA because ALBA's account at Interactive Brokers has been blocked by order of the United States government and because ALBA is an agency or instrumentality of FARC.[7]

Yet the agency or instrumentality relationship between ALBA and FARC is not self-evident. FARC was a terrorist and narco-trafficking organization from Colombia, while ALBA is an oil company from El Salvador. There is no claim that FARC directly owned or controlled ALBA. Instead, Caballero asserts a largely indirect agency or instrumentality relationship between FARC and ALBA—a relationship that principally turns on the actions of a third party from a third country—Venezuela's state-owned oil company, Petróleos de Venezuela, S.A. ("PDVSA").

---

[6] Doc. #28.
[7] Doc. #28-8 at 12-21.

According to Caballero, PDVSA was an agent of the corrupt Venezuelan regimes of Hugo Chavez and Victor Maduro and actively facilitated the use of Venezuelan territory and resources to launder money for FARC and to assist FARC's narco-trafficking activities.[8] Caballero further claims that PDVSA is a 60% owner of ALBA, and that PDVSA used ALBA to launder money.[9] Thus, by means of PDVSA's ownership of ALBA and its alleged use of ALBA on FARC's behalf (as well as other PDVSA efforts to assist FARC), Caballero claims that ALBA is an agency or instrumentality of FARC within the scope of TRIA.

This case was originally assigned to Judge Chatigny, who entered a temporary restraining order on December 23, 2020 freezing ALBA's account at Interactive Brokers pending a hearing on the application for turnover.[10] Judge Chatigny also set expedited dates for service on ALBA and Interactive Brokers (January 1, 2021), for the filing of any objections (January 5, 2021), and for a hearing (January 7, 2021).[11]

The docket reflects that ALBA was served by international FedEx delivery on December 31, 2020.[12] Interactive Brokers was not served until January 4, 2021.[13] Neither ALBA nor Interactive Brokers filed an objection by the deadline of January 5, 2021.[14] On January 14, 2021, Judge Chatigny granted Caballero's application for turnover.[15]

---

[8] *Id.* at 12-16.

[9] *See Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 579 F. Supp. 3d 315, 319 (D. Conn. 2022) (noting that "ALBA is 60% owned by PDV Caribe, S.A, which is 100% owned—directly or indirectly—by Venezuela's state-owned oil company: Petróleos de Venezuela, S.A. ('PDVSA')" and that "ALBA is 40% owned by ENEPASA, which is an inter-municipal nonprofit owned by 17 Salvadoran municipalities"), *appeal dismissed, mandamus denied sub nom. In re ALBA Petroleos de El Salvador S.E.M. de C.V.*, 82 F.4th 105 (2d Cir. 2023); Doc. #192 at 34.

[10] Doc. #43 at 6.

[11] *Id.* at 5.

[12] Doc. #45 at 2, 7-8 (service of application for a turnover order and Court's order to show cause on December 31, 2020). Judge Chatigny's order required not only service by mail but also by email, but the service return reflects that two emails sent to ALBA were returned as undelivered. *Id.* at 2.

[13] *Id.* at 4-6.

[14] Doc. #50.

[15] Doc. #53; *Caballero v. Fuerzas Armadas Revolucionarias De Columbia*, 2021 WL 6339256, at *1 (D. Conn. 2021).

Caballero then tried to compel Interactive Brokers to turn over the funds. But instead of doing so, Interactive Brokers filed a third-party interpleader complaint on February 5, 2021, citing the competing claims made to the account by Caballero, ALBA, and two other groups of FARC victims (known as the "Stansell claimants" and "Pescatore claimants").[16]

Next, on March 17, 2021, ALBA moved to intervene and to stay and dismiss the turnover order.[17] It argued that Caballero's Florida judgment against FARC was invalid, that it was not properly noticed and served by Caballero with his turnover motion, that it was not subject to personal jurisdiction in the District of Connecticut, and—on the merits—that it was not an agency or instrumentality of FARC as Caballero claims.[18]

The case was then transferred to me, and I entered an order granting ALBA's motion to intervene and staying execution of the turnover order pending further briefing to determine whether the turnover order should be enforced.[19] But the case was soon bogged down with a complex dispute between two different groups of lawyers who claimed that they had the right to represent ALBA in this action. I ruled in favor of one group of lawyers, and late last year the Second Circuit dismissed an appeal of this ruling. *See Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 579 F. Supp. 3d 315, 317 (D. Conn. 2022), *appeal dismissed, mandamus denied sub nom. In re ALBA Petroleos de El Salvador S.E.M. de C.V.*, 82 F.4th 105 (2d Cir. 2023). While that appeal was pending, Caballero reached a settlement with the Stansell/Pescatore claimants, leaving him as the sole plaintiff seeking turnover of ALBA's account.[20]

---

[16] Doc. #64.
[17] Doc. #90.
[18] *See generally* Doc. #175-1.
[19] Doc. #160.
[20] Doc. #210.

Now pending before me are two principal motions. First, Caballero moves to dismiss Interactive Broker's third-party complaint and to compel immediate turnover of ALBA's funds.[21] Second, ALBA moves to vacate the turnover order and to dismiss the action.[22]

## DISCUSSION

I will first address Caballero's motion to dismiss the interpleader complaint. Then I will address ALBA's arguments to vacate the turnover order and to dismiss this action.

### *Caballero's motion to dismiss Interactive Broker's third-party complaint*

Caballero moves to dismiss Interactive Brokers' third-party complaint seeking interpleader relief on the ground that it is procedurally improper. I do not agree. "Interpleader is a procedural device used to resolve conflicting claims to money or property. It enables a person or entity in possession of [contested property] to join in a single suit two or more claimants asserting mutually exclusive claims to that stake." *Madison Stock Transfer, Inc. v. Exlites Holdings Int'l, Inc.*, 368 F. Supp. 3d 460, 472 (E.D.N.Y. 2019).[23] "[I]nterpleader is proper so long as the party requesting it has real or reasonable fear of double liability or vexatious, conflicting claims." *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).

Federal courts have subject matter jurisdiction over interpleader actions involving (1) two or more adverse claimants, (2) $500 or more in property, and (3) minimal diversity of citizenship. *See* 28 U.S.C. § 1335(a). This case easily meets all three criteria. Two adverse

---

[21] Docs. #173, #211. The Stansell/Pescatore claimants previously moved to dismiss or for transfer of this action. Doc. #174. But after reaching a settlement with Caballero, the Stansell/Pescatore claimants withdrew their motion in order to join with Caballero in a renewed motion for relief. Docs. #209, #210, #211. Accordingly, I will deny the Stansell/Pescatore motion as moot.

[22] Doc. #175; *see also* Doc. #200 at 2 (arguing that "the orders should be vacated and ALBA permitted to be heard on its challenges to Caballero's proceeding").

[23] Unless otherwise noted and for ease of reading, this ruling omits all internal quotations, brackets, and derivative citations from quotations of cases cited in the ruling.

parties—Caballero and ALBA—claim the funds in the Interactive Brokers account. The value of the account is alleged to be over $500.[24] And the two claimants are diverse—Caballero is a citizen of Florida, and ALBA is a foreign corporation headquartered in El Salvador and majority-owned by a Venezuelan company.[25]

Rule 22 of the Federal Rules of Civil Procedure also authorizes an interpleader action by parties exposed to double or multiple liability. *See* Fed. R. Civ. P. 22. And Connecticut law further permits an interpleader action by a party who has possession of property that is claimed by two or more persons. *See* Conn. Gen. Stat. § 52-484. Although Caballero raises various technical arguments about why one or another of these provisions does not apply, I agree with Interactive Brokers that these arguments elevate form over substance and should not defeat the ability of Interactive Brokers to seek relief by way of an interpleader action.

Caballero argues that Interactive Brokers' third-party complaint is untimely. He maintains that Interactive Brokers and ALBA were required to assert any claims to the account within 20 days of being served with his application for a turnover order under Conn. Gen. Stat. § 52-356c, Connecticut's "determination of interests" statute. He also argues that the interpleader action was filed too late as a general matter. I do not agree with either argument. For the reasons outlined at length by both Interactive Brokers and by ALBA, I am not convinced that the initial notices they received of these turnover proceedings were sufficient to reasonably allow them to assert their claims and interests within the 20-day time period provided under § 32-356c.[26] Nor am I convinced that Interactive Brokers was otherwise dilatory in filing its complaint. The earliest that the firm may have received actual notice of the case was January 4, 2021, and the

---

[24] Doc. #64 at 4-5 (¶ 11).
[25] Doc. #91 at 1; Doc. #64 at 3 (¶ 6).
[26] Doc. #184 at 7-9, 33-34; Doc. #191 at 4.

firm filed its interpleader complaint 32 days later.[27] A delay of a month between learning of a potential claim and filing an action is not unreasonable. Nor does Caballero point to any provisions in the federal interpleader statutes or rules that require quicker action.[28]

Both Interactive Brokers and ALBA promptly moved to assert their rights after they received proper and actual notice of these proceedings. As such, I conclude that neither Interactive Brokers nor ALBA have waived their rights to be heard with respect to Caballero's application for turnover.

Finally, the fact that one of the claimants—ALBA—disputes personal jurisdiction does not mean that an interpleader action is improper. Other courts facing challenges to personal jurisdiction in interpleader cases have adjudicated those challenges in the ordinary course of litigation, and proceeded if they have jurisdiction. *See, e.g.*, *Madison Stock Transfer, Inc*, 368 F. Supp. 3d at 473, 487-88 (denying motion to dismiss statutory interpleader action predicated on lack of personal jurisdiction); *see also Windmill Distrib. Co., L.P. v. Jaigobind*, 2023 WL 4565402, at *3-4 (E.D.N.Y. 2023), *report and recommendation adopted sub nom. Windmill Distrib. Co., L.P. v. Jaigoband*, 2023 WL 4564913 (E.D.N.Y. 2023) (same).

In short, this case meets the requirements for interpleader. Accordingly, I will allow the interpleader claim to proceed. Ordinarily, the party seeking statutory interpleader must deposit the contested funds with the Court. However, because ALBA's Interactive Brokers account is

---

[27] Doc. #45 at 1 (noting delivery of the application for a turnover order to Interactive Brokers' Greenwich office on January 4, 2021); Doc. #64 at 7 (¶ 20). Though the state marshal who delivered the application also emailed it to Interactive Brokers, the firm represents that this email was flagged as a phishing attempt, and the attached documents were not accessed. *Id.* at 6-7 (¶ 19).

[28] For his timeliness argument, Caballero cites only an unpublished case stating that "intervention after final judgment is disfavored precisely because by its very nature it fosters delay and prejudice to existing parties." *See* Doc. #199 at 8 (citing *Lasala v. Needham & Co.*, 2006 WL 1206241, at *6 (S.D.N.Y. 2006)). But I have already granted ALBA's motion to intervene, and I would have to adjudicate its motion to vacate the turnover order regardless of whether the interpleader claim goes forward. So allowing Interactive Brokers to take advantage of interpleader would not raise the concerns that troubled the court in *Lasala*.

blocked by the federal government, I will not require Interactive Brokers to do so in this case.

*See Doe v. Ejercito De Liberacion Nacional*, 2016 WL 1073100, at *1 (S.D.N.Y. 2016). Instead,

I will permit Interactive Brokers to post an unsecured bond of $1,000 with the Clerk of the

Court. Upon posting of the bond, Interactive Brokers shall be discharged from liability after

disposing of the account as directed by a future order of the Court.

### *ALBA's challenge to the validity of the Florida judgment*

ALBA challenges Caballero's underlying default judgment against FARC on the ground

that the U.S. District Court for the Southern District of Florida lacked personal jurisdiction over

FARC. ALBA raises this challenge pursuant to Rule 60(b)(4) of the Federal Rules of Civil

Procedure, which allows a party to seek relief from a judgment on the ground that the judgment

is void.

"A default judgment is 'void' if it is rendered by a court that lacks jurisdiction over the

parties." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 138 (2d Cir. 2011).

Moreover, when a federal court judgment has been registered in another federal court, a party

seeking to resist enforcement of the judgment in the registrant court may seek relief under Rule

60(b)(4) on the ground that the original federal court lacked personal jurisdiction to enter a

default judgment. *See Brown v. Brockett*, 2018 WL 3625341, at *3 (E.D.N.Y. 2018) (citing

*Covington Indus., Inc. v. Resintex A. G.*, 629 F.2d 730, 732 (2d Cir. 1980)).

Still, however, a judgment may be declared void for want of jurisdiction only if the court

"plainly usurped jurisdiction, or, put somewhat differently, when there is a total want of

jurisdiction and no arguable basis on which it could have rested a finding that it had

jurisdiction." *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 53 (2d Cir. 2021). A court's

judgment may be sustained so long as "the district court had, at a minimum, an arguable basis to

exercise jurisdiction when it entered its default judgment order." *Eliav v. Millennium Prod. Grp., LLC,* 857 F. App'x 699, 701 (2d Cir. 2021).

As an initial matter, to the extent that ALBA disputes whether the Florida court had personal jurisdiction over FARC, ALBA lacks standing to proceed. Only FARC could assert its own personal rights and interests to be free from entry of judgment against it in the absence of personal jurisdiction. *See Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 562 F. Supp. 3d 867, 879-80 (C.D. Cal. 2021) (alleged agency or instrumentality of FARC had no standing to assert rights of FARC to be free from entry of default judgment in the absence of personal jurisdiction); *Stansell v. Revolutionary Armed Forces of Colombia*, 2022 WL 2530359, at *10-12 (S.D.N.Y. 2022) (third-party claimants did not have standing to assert right of FARC to be free from entry of default judgment in the absence of personal jurisdiction), *report and recommendation adopted*, 2022 WL 17830551 (S.D.N.Y. 2022).

In any event, ALBA's challenges to the Florida court's exercise of personal jurisdiction over FARC fall short on their merits. First, ALBA argues that FARC was not properly served with process in the Florida action. Rule 4(h)(1)(B) of the Federal Rules of Civil Procedure permits service on unincorporated organizations like FARC "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process." Here, Caballero personally served Juvenal Ovidio Ricardo Palmera Pineda, a high-ranking FARC leader who is serving a sixty-year sentence in federal prison.[29] This manner of service at least arguably complies with Rule 4(h)(1)(B). *See Marron v. Moros*, 2023 WL 357592, at *2 (S.D. Fla. 2023) ("[s]erving an

---

[29] *United States v. Palmera Pineda*, 592 F.3d 199, 199-200 (D.C. Cir. 2010); *Alban Osio v. Moros*, 2023 WL 5019877, at *1 (S.D. Fla. 2023), *report and recommendation adopted*, 2023 WL 5015435 (S.D. Fla. 2023); *Pescatore v. Palmera Pineda*, 2010 WL 11748172, at *2 (D.D.C. 2010).

officer of a foreign criminal association through one of its leaders effectuates valid service on the criminal organization"); *see also Ests. of Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 257-59 (D.R.I. 2004) (approving service on Hamas via service on one of the group's high-level operatives at his U.S. residence).[30]

Second, ALBA argues that FARC lacked minimum contacts with the United States as required under the Due Process Clause to sustain a court's exercise of personal jurisdiction over a party. A nonresident defendant is subject to specific personal jurisdiction in a forum when that defendant has "minimum contacts" with the forum and when the suit "arise[s] out of or relate[s] to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017). When a federal court adjudicates an ATA claim, the Fifth Amendment— rather than the Fourteenth Amendment—governs the personal jurisdiction question, and so the relevant forum to be considered is the entire United States, not just the federal district where the suit has been brought. *See Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 86 & n.6 (2d Cir. 2023); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 329-30 (2d Cir. 2016).

Here, there is enough evidence to arguably establish FARC's minimum contacts with the United States. In the Florida court, Caballero submitted findings of fact made by a state court, including the conclusion that "[FARC's] kidnapping and eventual assassination of Ambassador Caballero was a necessary component part of [its] overall criminal activity and scheme to traffic illicit drugs into South Florida and the United States for [its] profit and gain."[31] And in this case, Caballero has offered evidence that FARC was once responsible for supplying significant amounts of cocaine to the United States, an activity that was clearly directed at the United States

---

[30] Other courts have acknowledged the propriety of service on FARC by means of service on Palmera Pineda. *See Caballero v. Fuerzas Armadas Revolucionarias De Colombia*, 1:18-cv-25337 (S.D. Fla.), Doc. #25-1 at 2 (describing personal service of Palmera Pindea); *see also Alban Osio*, 2023 WL 5019877, at *1 (same).
[31] *Caballero v. Fuerzas Armadas Revolucionarias De Colombia*, 1:18-cv-25337 (S.D. Fla.), Doc. #1-1 at 8-9 (¶ 27).

as a forum.[32] A court could reasonably conclude that murdering a vocal opponent of narcotics trafficking would further that undertaking as directed toward the United States. *Cf. In re Terrorist Attacks on Sept. 11, 2001,* 714 F.3d 659, 678 (2d Cir. 2013) (personal jurisdiction might lie against foreign defendants who "directly provided financial and other resources to al Qaeda knowing that al Qaeda was engaged in a global campaign of terror directed at the United States"). There was at least an arguable basis for the Florida court to exercise personal jurisdiction over FARC.

Beyond its personal jurisdiction challenges to the Florida judgment, ALBA also disputes whether the Florida court had subject matter jurisdiction to enter a default judgment against FARC. But the Florida court undoubtedly had federal-question subject matter jurisdiction under 28 U.S.C. § 1331 to address Caballero's claim against FARC under a federal statute like the ATA. ALBA argues that Caballero was not a U.S. citizen when his father was murdered and the ATA only permits suits by plaintiffs who were U.S. nationals at the time their cause of action accrued.[33] But this is a merits argument about the scope of the ATA, not a jurisdictional argument that dispels the Florida court's subject matter jurisdiction to address the scope of the ATA in the first instance. *See, e.g.*, *Stansell*, 2022 WL 2530359, at \*8-9 (rejecting the same argument).[34] Accordingly, because the Florida court had at least arguable subject matter jurisdiction, ALBA has failed to show that the default judgment against FARC was altogether void under Rule 60(b)(4).

---

[32] Doc. #28-2 at 4 (¶ 7).

[33] Doc. #175-1 at 44-47.

[34] ALBA also makes another merits argument about the scope of TRIA: that TRIA applies only to the agency or instrumentalities of state sponsors of terror, as distinct from non-state terrorist entities like FARC. *Id.* at 17-19. But this argument is foreclosed by *Kirschenbaum v. 650 Fifth Avenue and Related Properties*, 830 F.3d 107, 133-34 (2d Cir. 2016).

### *ALBA's challenge to service of process*

ALBA argues that it was not validly served with Caballero's application for turnover. It argues that it was not served with process in compliance with Rule 4(f) of the Federal Rules of Civil Procedure. But Rule 4(f) provides that service on a person in a foreign country may be effectuated either "by any internationally agreed means of service that is reasonably calculated to give notice" or "*by other means not prohibited by international agreement, as the court orders*." Fed. R. Civ. P. 4(f)(1) & (3) (emphasis added); *see also Jian Zhang v. Baidu.com Inc*., 293 F.R.D. 508, 511-15 (S.D.N.Y. 2013) (discussing Rule 4(f)(3) as an alternative means for service of process on foreign corporation).

Here, Judge Chatigny entered an order specifying the means by which ALBA should be served.[35] Caballero properly served ALBA in compliance with that court order by having a state marshal mail a copy of the application for a turnover order and the Court's temporary restraining order to ALBA at its address in El Salvador and by means of filing on the docket a proof of delivery with signature at this address.[36] ALBA makes no showing that this court-ordered means of service is prohibited by any international agreement. Accordingly, I conclude that ALBA was properly served with the application for turnover in compliance with Rule 4(f)(3).[37]

---

[35] Doc. #43 at 5 (stating in relevant part that "Plaintiff shall give notice to Interactive Brokers, LLC and ALBA Petroleos de El Salvadaor S.E.M. de C.V.'s ('ALBA Petroleos') (to be served by Plaintiff pursuant to Connecticut General Statutes §52-59 by both courier, such as Federal Express, DHL, UPS or Global Express mail, and by email) of the pendency of the application and of the time when it will be heard by causing a true and attested copy of the Application, the proposed turnover order and of this order to be served upon Interactive Brokers and ALBA Petroleos by some proper officer or indifferent person on or before January 1, 2021, and that due return of service be made to this court.").

[36] Doc. #45 at 2, 7-8 (service of application for turnover order and Court's order to show cause on December 31, 2020). The record also reflects later service of the Court's turnover order on ALBA. *See* Doc. #55 at 1, 6-7 (service of Court's turnover order on January 19, 2021).

[37] ALBA further argues that, if state law service rules govern, it was not properly served under Conn. Gen. Stat. § 52-356b(d). Doc. #175-1 at 16 n.3. But assuming that provision applies, it only covers the service of an *issued* turnover order, not service of an *application* for a turnover order. *See* Conn. Gen. Stat. § 52-356b(d). Because ALBA does not rely on any other state law provisions, I have no occasion to consider whether they might apply. *See* Fed. R. Civ. P. 69(a) (noting that "[a] money judgment is enforced by a writ of execution" and that "[t]he procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the

### *ALBA's due process challenge to personal jurisdiction*

ALBA argues that, because it is an El Salvadoran company with no business activity in the United States, the Court's exercise of jurisdiction in this case would violate its right to due process. "The Supreme Court has recognized three distinct bases for exercising personal jurisdiction over an out-of-forum defendant in accordance with the dictates of due process: general jurisdiction, specific jurisdiction, and consent." *Fuld*, 82 F.4th at 86. As relevant here, "a court may exercise specific jurisdiction if the defendant has 'purposefully availed itself of the privilege of conducting activities within the forum,'" provided that "the court's authority is limited solely to claims that 'arise out of or relate to' the defendant's forum contacts." *Id.* at 87 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) and *Ford Motor Co. v. Montana Eighth Jud. Dist.*, 592 U.S. 351, 359 (2021)).

Here, ALBA chose to invest its money with a brokerage company in Connecticut. In other words, it purposefully availed itself of the privilege of conducting activities in Connecticut and the United States in general. Moreover, this litigation directly arises from and relates to this activity. Indeed, the case is solely about ALBA's right under TRIA to retain the funds that it chose to invest in the United States. All the requirements for the exercise of specific jurisdiction are established here.

ALBA misplaces its reliance on the Supreme Court's decision in *Shaffer v. Heitner*, 433 U.S. 186 (1977). There, a plaintiff filed an action in Delaware state court against a Delaware company and certain individual defendant stockholders for actions that took place in Oregon. *Id.*

---

procedure of the state where the court is located, but a federal statute governs to the extent it applies"); Conn. Gen. Stat. § 52-350e ("service of process concerning a postjudgment procedure, or concerning a determination of interest in property pursuant to section 52-356c, may be made (1) by a proper officer sending a true and attested copy thereof by certified mail, return receipt requested, to a person at his last-known address."); Conn. Gen. Stat. § 52-351a (stating that "[w]hen a lien is placed on any property or when any postjudgment paper … is served on a third person, the judgment creditor shall send a copy of the lien, or of the papers so served, together with a statement as to where the lien was filed or on whom the papers were served, to the judgment debtor at his last-known address").

at 189-90. Notwithstanding the lack of any connection between Delaware and the actions of the individual defendants, the plaintiff sought to take advantage of a Delaware "sequestration" statute that provided for the seizure of the individual defendants' Delaware stock shares until they would agree to submit to the jurisdiction of the Delaware court. *Id.* at 191-93.

The Supreme Court ruled under these circumstances that the Delaware court lacked personal jurisdiction over the individual defendants. *Id.* at 213-17. "The Delaware courts based their assertion of jurisdiction in this case solely on the statutory presence of [the defendants'] property in Delaware. Yet that property is not the subject matter of this litigation, nor is the underlying cause of action related to the property." *Id.* at 213. In so ruling, the Supreme Court made clear that the exercise of jurisdiction would be proper if the subject matter of the litigation involved a claim of right to the property itself: "when claims to the property itself are the source of the underlying controversy … it would be unusual for the State where the property is located not to have jurisdiction" because "the defendant's claim to property located in the State would normally indicate that he expected to benefit from the State's protection of his interests." *Id.* at 207-08. That is the situation presented here.

Not surprisingly, in such cases where the underlying dispute involves a claim of right to property located in the judicial forum, other courts have declined to interpret *Shaffer* to foreclose the exercise of jurisdiction over a foreign defendant to the extent of its claimed interest in the property. *See Mattel, Inc. v. Barbie-Club.com*, 310 F.3d 293, 294-95, 299, 302-03 (2d Cir. 2002) (Sotomayor, J.) (affirming exercise of *in rem* jurisdiction for a suit seeking the cancellation or transfer of a domain name registration in the New York forum where the domain name was "located," despite the lack of any other basis for personal jurisdiction over the foreign domain name registrant); *Bloom v. Emden*, 2022 WL 799096, at *1, *6-7 (S.D.N.Y. 2022) (exercising *in*

*rem* jurisdiction over lawsuit about title to a painting located in the forum despite the fact that the defendants from Chile lacked any other contacts with the New York forum); *see also Caballero*, 562 F. Supp. 3d at 882-85 (rejecting similar due process challenge by alleged foreign-based agency or instrumentality).

Here, personal jurisdiction over ALBA is not premised solely on the mere or fortuitous presence of ALBA's property in the United States. Instead, because the very subject matter of this litigation involves Caballero's claim of right under TRIA to the turnover of this property, the litigation arises from and relates to the property. Having chosen to invest its funds in the United States, ALBA could reasonably expect that United States courts would adjudicate any claims involving its right to the property. Accordingly, the exercise of personal jurisdiction over ALBA to the extent of its interest in its property invested with Interactive Brokers in the United States does not violate ALBA's due process rights.

### ALBA's right to a hearing

Apart from its various jurisdictional challenges as described above, ALBA argues that the Court should vacate the turnover order because it did not have an adequate opportunity before the Court entered its *ex parte* order to contest Caballero's claim that it was an agency or instrumentality of FARC. ALBA argues that it has substantial grounds to dispute that it was an agency or instrumentality of FARC. I agree with ALBA.[38]

"Rule 60(b)(6) grants federal courts broad authority to relieve a party from a final judgment upon such terms as are just, provided that the motion is made within a reasonable time

---

[38] ALBA also argues that Caballero cannot seize its assets under the TRIA because FARC is no longer a terrorist party. Doc. #175-1 at 38-40. It points out that the Secretary of State revoked FARC's designation as a "Foreign Terrorist organization" on November 30, 2021. *Id.* at 38. But Caballero won his judgment against FARC and initiated this registration action well before November 2021, and federal law provides that the revocation of the "Foreign Terrorist Organization" designation "shall not affect any action or proceeding based on conduct committed prior to the effective date of such revocation." 8 U.S.C. § 1189(a)(7). Accordingly, ALBA cannot escape TRIA liability on that basis.

16

and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)."
*Mandala v. NTT Data, Inc.*, 88 F.4th 353, 361 (2d Cir. 2023). "It constitutes a grand reservoir of
equitable power to do justice in a particular case." *Ibid.* But such relief is only available under
"extraordinary circumstances." *Ibid.* "In determining whether extraordinary circumstances are
present, a court may consider a wide range of factors" including "the risk of injustice to the
parties and the risk of undermining the public's confidence in the judicial process." *Buck v.
Davis*, 580 U.S. 100, 123 (2017). The "whole purpose of Rule 60(b) is to make an exception to
finality, and the Rule is designed to afford parties an opportunity to resolve a dispute on the
merits." *Mandala*, 88 F.4th at 361-62.

  Although I do not doubt that ALBA was properly served in this action, I am not confident
that ALBA had a fair opportunity to contest the turnover order before its entry. The earliest the
company might have received notice of Caballero's application for a turnover order was
Thursday, December 31, 2020. A hearing on the application was set for January 7, 2021, and
ALBA was required to enter an appearance and file any objections by January 5, 2021.[39] In many
cases, that might be enough time for a party to enter an appearance and at least ask the Court to
move the hearing date. But several factors make it difficult to conclude that ALBA had enough
time to meet the Court's deadlines.

  First, the Office of Foreign Assets Control ("OFAC") imposes restrictions on the
payment of U.S-based attorneys by blocked entities like ALBA, which inhibited the company's
search for an attorney.[40] Because corporations like ALBA cannot appear in federal court without

---

[39] Doc. #43 at 5-6.
[40] Doc. #191 at 4. As ALBA acknowledges, it is a blocked entity, and a "U.S. person generally may not engage in
any transactions with such an entity, unless authorized by OFAC." Doc. #175-1 at 22; *see also* U.S. DEP'T OF
TREASURY, *Revised Guidance on Entities Owned by Persons Whose Property and Interests in Property are Blocked*,
(2014), https://ofac.treasury.gov/media/6186/download?inline [https://perma.cc/45GS-T3J4]. So ALBA's attorney
needed OFAC authorization in order to be paid. *See* U.S. Dep't of Treasury, *Filing a Petition for Removal from an
OFAC List*, https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/filing-a-petition-for-removal-from-

counsel, ALBA could not meet the Court's January 5 deadline until its attorney hiring process was complete. In addition, the timing and manner of Caballero's service on ALBA complicated matters. Although the Court required Caballero to serve ALBA by both international mail and email, Caballero was only able to complete the former, because its service emails bounced.[41] As a result, ALBA was only notified of the case via a mailing that arrived at its office in El Salvador on New Year's Eve.[42]

Moreover, it is far from clear that ALBA was an agency or instrumentality of FARC. Although Caballero made an initial showing of this relationship in his application for turnover, ALBA has responded with its own evidence to call this conclusion into question.

To demonstrate that ALBA is an agency or instrumentality of FARC under TRIA, Caballero must show that ALBA (1) was a means through which a material function of FARC was accomplished, (2) provided material services to, on behalf of, or in support of FARC, or (3) was owned, controlled, or directed by FARC. *See Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107, 135 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018). Some courts have also held that an entity can only be liable under TRIA if it is an agency or instrumentality at the time the registration action is filed.[43] *See id.* at 136 (denying summary judgment when "questions of fact exist[ed] as to whether [the purported agency or instrumentality] was so owned, controlled, or directed at the time Plaintiffs' complaints were filed"); *see also Does 1 Through 7 v. The Taliban*, 2023 WL 4532763, at *6 (N.D.N.Y. 2023) ("[c]ourts assess whether an entity is an agency or instrumentality of a terrorist

---

an-ofac-list [https://perma.cc/4GQD-GMT9] (last visited May 29, 2024).
[41] Doc. #45 at 2.
[42] I am also concerned by indications that Caballero's attorney did not contact counsel for Interactive Brokers or PDVSA about the application for the turnover order, despite apparently knowing that those attorneys represented the interested parties in this or similar actions. *See* Doc. #184 at 33-34; Doc. #175-1 at 13.
[43] The parties debate whether or not the Second Circuit has adopted this requirement. *See id.* at 20-21; Doc. #192 at 29-31. But I need not resolve that issue at this stage in the case.

party at the time that a party commences an enforcement proceeding against the entity"); *Levin v. 650 Fifth Ave. Co.*, 2023 WL 3818566, at *5 (S.D.N.Y. 2023) (plaintiff must demonstrate a defendant's agency or instrumentality status as of the commencement of the enforcement action); *but see Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1350 (11th Cir. 2022) ("the district court correctly rejected the contention that a third party must be an agency or instrumentality of a terrorist party at the time that execution or attachment is sought under the TRIA").

Applying this standard, Caballero's evidence that ALBA was a FARC agency or instrumentality is less than overwhelming. He attaches a declaration from former Treasury official John McBrien, which states "it has been established that PDVSA subsidiaries, ALBA Petroleos and ALBANISA, are used for money-laundering."[44] He further refers to the "critical role of ALBA … in the money laundering operations of FARC."[45]

But aside from these conclusory statements, McBrien makes no specific claims about ALBA's activities. And he does not speak to any activities that would establish ALBA as a FARC agency or instrumentality at the time of this enforcement action. Caballero's other source—government consultant Douglas Farah's 2017 testimony to Congress—is not much more help. That testimony occurred three years before the start of the relevant time period and cites primarily circumstantial evidence.[46]

Caballero's original turnover application focused primarily on PDVSA's relationship with FARC.[47] But even if I were to accept that PDVSA—ALBA's majority owner—is an agency or instrumentality of FARC, that does not compel the conclusion that ALBA is also an agency or

---

[44] Doc. #28-4 at 6-7 (¶ 13); *see also* Doc. #28-2 at 2-4 (¶¶ 1-6) (describing McBrien's credentials).
[45] Doc. #28-4 at 7 (¶ 14).
[46] Doc. #28-3 at 313-18; *see also* Doc. #188-1 at 2-9 (¶¶ 2-20) (describing Farah's credentials).
[47] Doc. #28-8 at 12-14.

instrumentality. After all, "a company is a separate legal entity from its shareholders." *Caballero*, 579 F. Supp. 3d at 324; *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).

Moreover, drawing that inference from mere corporate ownership alone would be inconsistent with the Second Circuit's definition of an agency or instrumentality, which requires that an individual or organization "(1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, or (3) was owned, controlled, or directed by the terrorist party." *Kirschenbaum*, 830 F.3d at 135. Being a company that is majority-owned by an agency or instrumentality does not invariably place the company in one of those three categories. PDVSA's ownership of ALBA is potentially relevant to the agency or instrumentality question, but it is not dispositive.

Meanwhile, ALBA has now submitted evidence of its own contesting Caballero's claims. It offers a declaration from a PDVSA official averring that the organization does not support FARC, as well as the attestations of a putative subject matter expert disputing a relationship between PDVSA and FARC.[48] It also provides a declaration from Jaime Alberto—ALBA's legal representative and vice-chairman—which denies knowledge of any actions taken by ALBA that supported or assisted FARC.[49] Finally—and importantly— Alberto maintains that the company's "commercial activities ended in May 2019."[50] If so, then this raises serious doubts about whether ALBA could have been supporting FARC in late 2020 when this action was filed.

---

[48] *See* Doc. #175-7 at 4 (¶ 14); Doc. #175-3 at 12 (¶ 52); *see also id.* at 2-4 (¶¶ 1-14) (describing declarant's credentials).
[49] Doc. #175-2 at 10 (¶ 10).
[50] *Id.* at 9 (¶ 8).

Finally, in a brief they have not withdrawn, the Stansell/Pescatore claimants attempt to bolster the case that ALBA is a FARC agency or instrumentality. They offer a declaration from Farah which states that "Hugo Chávez, Daniel Ortega and José Luis Merino jointly founded Alba Petróleo … in 2007 with the primary specific purpose of laundering FARC funds."[51] The judgment creditors also provide a 2020 Farah report, entitled "How to Make a Billion Dollars Disappear," which details this alleged money laundering.[52] But Farah's affidavit simultaneously undermines the case against ALBA, observing "[i]n May 2019 the Attorney General of El Salvador raided 27 offices of Alba Petróleos on suspicion of laundering $3.4 billion through an elaborate scheme … essentially ending the corporation's ability to continue to function."[53] This attestation corroborates Alberto's claim that ALBA stopped commercial operations in 2019, which casts further doubt on whether ALBA was at FARC agency or instrumentality at the time this action was filed.

All in all, I am convinced that there is a genuine issue of fact about whether ALBA was an agency or instrumentality of FARC—at any time or at the time that this action was filed. It would be unfair to adhere to the Court's turnover order when there is substantial doubt about the adequacy of ALBA's opportunity to have defended against the order and about the grounds for the Court's prior conclusion that ALBA was an agency or instrumentality of FARC. When there is a genuine issue of fact about whether an entity is an agency or instrumentality, a court should conduct an evidentiary hearing on the issue. *See Stansell*, 45 F.4th at 1356-60. Accordingly, I will leave in place the order freezing ALBA's account at Interactive Brokers but vacate the turnover order and conduct an evidentiary hearing on the agency or instrumentality issue.

---

[51] Doc. #188-1 at 35 (¶ 59). While the Stansell/Pescatore claimants did withdraw their motion, they left in place some of their filings relating to the other motions, including Doc. #188. *See* Doc. #209 at 3 n.4.
[52] Doc. #183 at 107.
[53] Doc. #188-1 at 34-35 (¶ 59).

## CONCLUSION

For the reasons set forth above, the Court DENIES Caballero's motions to dismiss the interpleader complaint, to dispense with the balance of the turnover hearing, and to compel immediate turnover (Docs. #173, #211). The Court GRANTS ALBA's motion to the extent it seeks to vacate the turnover order, but DENIES the motion to the extent that it seeks to dismiss this action (Doc. #175). Finally, the Court DENIES as moot the motion of the Stansell and Pescatore claimants to dismiss the case for lack of jurisdiction or transfer the case to a different federal court (Doc. #174). Counsel for Caballero and ALBA shall confer and file on or before **July 12, 2024** their respective proposals for dates for an evidentiary hearing and any related dates.

It is so ordered.

Dated at New Haven this 13th day of June 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge